UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-CR-0061-CVE |
| ) | |
| ROBERTO MONTOYA-RODRIGUEZ, ) | |
| ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion to Suppress (Dkt. # 11). Defendant asks the Court to suppress evidence seized following a search and arrest that occurred on April 4, 2009, at a gun show in Tulsa, Oklahoma. The government responds that the officer had probable cause to arrest defendant for the crime of carrying a concealed weapon, and argues that defendant's rights under the Fourth Amendment of the United States Constitution were not violated. The Court held an evidentiary hearing on July 2, 2009. See Dkt. # 13.

**I.**

On April 4, 2009, Roberto Montoya-Rodriguez attended the Wanenmacher Gun Show (Gun Show) at the Quik Trip Center in Tulsa, Oklahoma with his two stepsons. Tulsa County Sheriff's Deputy Christopher Yerton was working with an Immigration and Customs Enforcement (ICE) task force at the Gun Show. ICE Special Agent Stephen Williams was also present and was stationed near the entrance of the Gun Show. The ICE task force was targeting individuals who could be seeking to illegally transport weapons to Mexico, because the United States has a treaty with Mexico banning such transport from the United States to Mexico. Before entering the Gun Show, patrons

are required to disclose any firearms on their person for inspection, and to keep any firearms unloaded and visible at all times. Gun Show personnel also equip all checked firearms with zip-ties to prevent them from firing. Defendant entered the Gun Show with a .45 caliber pistol concealed in his waistband, but he did not disclose the pistol to anyone at the Gun Show or have the action disabled with a zip-tie as required by Gun Show rules.

Yerton and Williams both testified that they observed defendant lift up his shirt and they saw a firearm concealed in defendant's waistband. Yerton states that he was about 20 feet from defendant when he saw the firearm. Williams did not remember how far he was from defendant when he saw the firearm, but he was clear that he saw the firearm in defendant's waistband. Yerton and Williams recollect the events following their observation of the firearm differently, and defendant relies on these differing recollections to challenge the credibility of the two government witnesses.

Yerton testified that he immediately approached defendant after observing the concealed firearm, and placed him under arrest for carrying a concealed firearm in violation of Oklahoma law. Yerton states that he handcuffed defendant and removed the .45 caliber pistol from defendant's waistband. He states that he handed the firearm to Williams. Yerton testified that he led defendant to a more private location near the entry to the Gun Show, and Yerton informed defendant that he was under arrest for carrying a concealed weapon. Williams began to ask defendant questions about his immigration status. Yerton did not give defendant a <u>Miranda</u> warning and he did not hear Williams give defendant a <u>Miranda</u> warning. Yerton testified that Williams requested identifying information from defendant and learned that defendant was from Mexico. Yerton claims that defendant admitted that he was an illegal alien. Yerton claims that he and Williams spoke to

defendant in English. It is not clear from Yerton's testimony what booking procedures were followed or if defendant was charged with a crime under state law, but neither party presented evidence that defendant was actually charged with a misdemeanor for carrying a concealed firearm.

Williams testified that his purpose at the Gun Show was to target individuals who could be purchasing firearms with the intention of transporting them to Mexico, and he was stationed at the lower level of the Gun Show near the entrance. He saw defendant lift up his shirt to adjust his pants, and a concealed firearm was clearly visible. The firearm did not appear to have a zip-tie.[1] Williams states that Yerton approached defendant and asked to see defendant's firearm, but Yerton did not immediately place defendant under arrest. Yerton took possession of the gun and confirmed that there was not a zip-tie in the gun's firing mechanism. There appeared to be a language barrier between defendant and Yerton, and they were not able to communicate effectively in English. Yerton led defendant to a quieter place, and Williams spoke to defendant in Spanish. Neither Yerton nor Williams gave defendant a <u>Miranda</u> warning.[2] Williams asked defendant to identify his country of origin, and defendant stated that he was from Mexico. Defendant did not have any papers or

---

[1] At the suppression hearing, defense counsel drew a picture of a pistol and asked Williams whether the zip-tie would be visible if a pistol was concealed on defendant's person as described by Williams. <u>See</u> Defendant's Exhibit 1. The Court has reviewed the exhibit and Williams' testimony, and finds that some part of the zip-tie would have been visible to Yerton and Williams if the firearm had been checked and zip-tied in accordance with Gun Show rules.

[2] Although defendant did not specifically seek the suppression of any statements made after his arrest, the evidence presented at the suppression hearing established that defendant was not given a <u>Miranda</u> warning before police interrogated him, and the government has agreed that any statements made by defendant after his arrest are inadmissible, except for booking statements. The Court finds that defendant's statements containing booking information, such as his name and country of origin, may be admissible at trial, but any other statement made immediately following his arrest, including any statement by defendant that he was illegally in the United States at the time of his arrest, is inadmissible.

documents related to his immigration status and he admitted that he was in the United States illegally. Williams checked defendant's immigration file and found that defendant had submitted an application for legal status, but he abandoned the application and was in the United States illegally. Williams placed an ICE detainer on defendant and released him, but was not aware if Yerton placed defendant under arrest for a violation of state law.

It appears that the government can now establish that defendant was in the United States illegally on April 4, 2009, but it is not clear that either Yerton or Williams knew this before Yerton approached defendant. Defendant states that he was once married to a United States citizen and believed that he was legally in the United States on April 4, 2009. Dkt. # 11, at 2. The government states that defendant informed ICE agents that he knew he was in the United States illegally, and he was not in doubt of his immigration status. Dkt. # 12, at 2. Williams testified that he subsequently reviewed defendant's immigration file and fingerprint information, and determined that defendant was an illegal immigrant. As will be discussed below, it not necessary for the Court to resolve the issue of defendant's status, because it is not relevant to the issue raised in defendant's motion to suppress.[3]

---

[3]   Neither Yerton nor Williams would admit that defendant looks Hispanic, possibly because they are accused in the motion to suppress of "racial" (national origin) profiling. Their testimony as to defendant's appearance was not credible because, in terms of national origin, defendant objectively appears to be Hispanic. However, both officers testified that they were looking for people who might be purchasing weapons to transport to Mexico. In this particular case, it would have been reasonable for Yerton and Williams to target Hispanic individuals who might be transporting guns to Mexico, which would not have created an adverse inference that either Yerton or Williams were engaging in improper national origin profiling.

**II.**

Defendant claims that Yerton did not have reasonable suspicion to search him for a firearm, and any evidence seized during this illegal search should be suppressed. He argues that many people at the Gun Show were carrying firearms and there was nothing particularly suspicious about defendant that would have caused Yerton or Williams to reasonably fear for their own or public safety. The government responds that defendant was carrying an undisclosed and potentially loaded firearm at a Gun Show, and Yerton had probable cause to arrest defendant for a misdemeanor offense of carrying a concealed weapon.

Defendant argues that Yerton did not have reasonable suspicion to search defendant for a firearm, and defendant's Fourth Amendment rights were violated. The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" United States v. King, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). In balancing these interests, the Supreme Court has held that arrests, being the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause. Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007); United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996). Investigative detentions, which are Fourth Amendment seizures of limited scope and duration, are lawful if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity. Novitsky, 491 F.3d at 1253. In addition, "officers may effect a brief

non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need 'to assure the safety of the public and/or the individual.'" Id. at 1253 (quoting King, 990 F.2d at 1560) (emphasis added).

The government argues that Yerton had probable cause to arrest defendant because defendant was carrying a concealed firearm in violation of Oklahoma law. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been is or is being committed." United States v. Turner, 553 F.3d 1337, 1344 (10th Cir. 2009). "An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2007). The facts in this case are quite limited. Yerton and Williams testifed that they observed defendant carrying a concealed firearm at the Gun Show. It was not illegal for a person to carry a visible, unloaded firearm at the Gun Show, but people attending the Gun Show were not permitted to carry concealed weapons that were not inspected and fitted with zip-ties in accordance the Gun Show's rules.

Whether the Court treats the initial incident as a Terry stop or an arrest, the key issue before the Court is the credibility of Yerton's and Williams' statements that they saw defendant in possession of a concealed weapon hidden in his waistband. Defendant argues that there was nothing suspicious about carrying a gun at a gun show, because many people were carrying visible firearms or were looking at firearms displayed by vendors. Both Yerton and Williams testified without hesitation that they observed a firearm concealed in defendant's waistband, and they did not see a zip-tie or any other indication that the firearm had been checked in by Gun Show personnel. Their

testimony is consistent as to the location of the firearm and defendant's movement that disclosed the firearm, and their testimony is undisputed. The Court finds Yerton's and Williams' testimony credible on this particular issue.[4] While many people may have been carrying visible and unloaded firearms zip-tied to prevent the firearms from firing, defendant was carrying a concealed and potentially loaded firearm without any locking mechanism in the firearm's action. The government argues that it was illegal for defendant to be carrying a concealed firearm, and Yerton could have initiated the arrest based on this fact alone. Yerton testified that it is a crime to carry a concealed weapon and he can arrest a person who may be illegally carrying a concealed weapon. He recognized that Oklahoma law does allow a person to carry a concealed firearm if he or she has a permit, but the proper procedure is to initiate an arrest before requesting to see a person's permit. If a person has a concealed-carry permit, he or she will be released, but it necessary to effect an arrest before requesting a person's permit in the interests of public and officer safety.

Yerton's testimony is consistent with the Court's independent assessment of Oklahoma law concerning the possession of concealed firearms. Under Oklahoma law, it is illegal for a person to carry a concealed weapon unless that person has obtained a license from the State. See OKLA. STAT. tit. 21, § 1272 ("It shall be unlawful for any person to carry upon or about his or person . . . any pistol, revolver, shotgun or rifle whether loaded or unloaded . . . except this section shall not prohibit . . . [t]he carrying or possession of weapons in a manner otherwise permitted by statute or authorized by the Oklahoma Self-Defense Act . . . ."). This is a misdemeanor punishable by up to 30 days in

---

[4]  Yerton and Williams recall the events following this observation differently. However, the central issue for defendant's motion to suppress is whether defendant violated Oklahoma law by carrying a concealed firearm. The Court finds their testimony credible to the extent that they observed a concealed firearm on defendant's person, and had probable cause to arrest defendant for carrying a concealed firearm.

7

county jail for a first offense. Id. at § 1276.  A person may obtain a license to carry a concealed firearm under the Oklahoma Self-Defense Act, OKLA. STAT. tit. 21, § 1290.1 et seq.  This potentially creates an issue as to whether Yerton should have conducted some investigation into defendant's right to carry a concealed firearm, because Oklahoma does allow a person to carry a concealed firearm under some circumstances.  However, the Oklahoma Court of Criminal Appeals has held that a police officer who observes a concealed firearm has a "duty" to arrest a person carrying a concealed weapon and take the weapon into custody. Allen v. State, 450 P.2d 516 (Okla. Cr. App. 1969).  The Supreme Court has held that it is constitutionally reasonable for a police officer to arrest a person for even a minor offense if the officer has probable cause to believe that the person has committed a crime. Virginia v. Moore, 128 S. Ct. 1598, 1604 (2008).  Thus, Yerton did not violate the Fourth Amendment by arresting or searching defendant if he believed that defendant was carrying a concealed firearm in violation of Oklahoma law.

Even if the Court were to assume that defendant did not commit a crime by carrying a concealed firearm, the fact that defendant did not disclose the firearm in his possession created an important distinction between defendant and other patrons of the Gun Show.  Yerton and Williams could have been concerned that a person carrying a concealed weapon, as opposed to patron of the Gun Show carrying a visible and tied firearm, presented a danger to others at the Gun Show. Defendant makes a significant point that Yerton and ICE agents were targeting Hispanic individuals at the Gun Show.  However, both Yerton and Williams testified that the ICE task force was present at the Gun Show in an attempt to locate individuals who may be smuggling guns to Mexico, and in this unique circumstance it would have been appropriate to consider a person's national origin as a factor in a reasonable suspicion or probable cause analysis.  Defendant has not clearly raised a

claim of selective enforcement and, even if he did, there would have been nothing improper in placing some significance on defendant's national origin under the facts of this case. See United States v. Armstrong, 517 U.S. 456 (1996) (a decision to prosecute may not be based solely on an invidious factor such as race, religion or national origin, but a defendant bears a heavy burden to present clear evidence that the defendant's equal protection rights were violated); Marshall v. Columbia Lea Reg. Hosp., 345 F.3d 1157 (10th Cir. 2003) (the person alleging discrimination has the burden to prove that police were motived by a discriminatory purpose and this was a motivating factor for the decision to stop or arrest the person).  There  is no evidence that either Yerton or Williams acted with an improper or discriminatory intent, and defendant's suggestion that he was targeted due to his national origin does not entitle him to suppression of evidence.

In his motion to suppress, defendant does not argue that he innocently or inadvertently neglected to disclose his firearm when entering the Gun Show; however, questions posed by defense counsel at the suppression hearing suggest that defendant intended to argue that he innocently failed to comply with the Gun Show's rules, and the Court will consider this argument.  To obtain a conviction under § 1272, it is necessary for the finder of fact to find that the defendant had "guilty intent or knowledge" before convicting him or her of unlawfully carrying a concealed weapon. Dear v. State of Oklahoma, 773 P.2d 760, 761 (1989).  Even if the Court were to assume that defendant inadvertently failed to disclose his firearm when entering the Gun Show, Yerton was not required to assess defendant's intent before approaching him to view the gun or arrest defendant because Yerton's observations gave rise to probable cause that defendant was violating § 1272. Defendant's intent may be a defense to the substantive offense of unlawfully carrying a concealed weapon, but

it has no bearing on the propriety of Yerton's decision to approach defendant and effect a Terry stop or an arrest.

Based on the facts elicited at the suppression hearing, Yerton had reasonable suspicion to believe that defendant was committing a crime by carrying a concealed firearm and his search of defendant's person was not unconstitutional.  Even if the Court were to treat the incident as an arrest rather than a Terry stop, Yerton had probable cause to believe that defendant was committing a crime by carrying a concealed firearm.  While Yerton's and Williams' recollection is inconsistent in some respects, the Court has found their testimony credible to the extent that they claim to have observed a concealed firearm in defendant's waistband.  This fact alone is sufficient to give rise to reasonable suspicion or probable cause that defendant was committing a crime, and Yerton did not violate the Fourth Amendment by approaching defendant and initiating either a Terry stop or an arrest.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Dkt. # 11) is **denied**.

**DATED** this 7th day of July, 2009.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT